FILED
04/21/2025
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 19, 2024 Session

**CASEY LEE ANDERSON v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Bledsoe County**
**No. 2016-CR-1      John Harvey Cameron, Judge**

———————————————————

**No. E2024-00098-CCA-R3-PC**

———————————————————

The Petitioner, Casey Lee Anderson, pled guilty to second degree murder and received a sentence of nineteen years' imprisonment. He later filed a petition for post-conviction relief, claiming that the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose a witness statement before he entered the plea. After a hearing, the post-conviction court granted relief, finding that the State had violated *Brady* by failing to disclose the statement. On appeal, the State argues that the post-conviction court erred in granting relief, asserting that the Petitioner failed to prove that the statement was material. Upon our de novo review, we agree with the State. As such, we respectfully reverse the post-conviction court's judgment and remand the case to reinstate the Petitioner's conviction.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgment of the Circuit Court Reversed; Case Remanded**

TOM GREENHOLTZ, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JOHN W. CAMPBELL, SR., J., joined.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Hornsby, Assistant Attorney General; Courtney Lynch, District Attorney General; and Steven Strain and Cara Sapp, Assistant District Attorneys General, for the appellant, State of Tennessee.

Elizabeth Greer Adams and Michael P. Dowd, Dunlap, Tennessee, for the appellee, Casey Lee Anderson.

# OPINION

## FACTUAL BACKGROUND

### A. THE PETITIONER'S SHOOTING OF MR. SMITH

In April 2014, the Petitioner stayed at a property in Bledsoe County with Orlando Smith, who was also known as "Big O." The Petitioner and Mr. Smith were helping the property owner with various improvements, and they resided in a camper along with Brittany Lively and Jennifer Willin.

In the early morning hours of April 22, 2014, the Petitioner shot Mr. Smith after Mr. Smith entered the camper wearing gloves and brandishing a pistol in the direction of Ms. Lively and Ms. Willin. The shooting started in the camper and then proceeded outside. During this time, the Petitioner used three different weapons, fired at least twenty shots, and ultimately killed Mr. Smith.

After the shooting, the Petitioner obscured Mr. Smith's body by placing cardboard over him and surrounding him with trash and trash cans. The Petitioner did not call the police but instead tried to clean blood out of the camper with water and ammonia. The three waited for the property owner to return later that evening to explain what happened. Upon his return, the property owner contacted law enforcement immediately. When the officers arrived, they took the Petitioner into custody at the scene.

#### 1. Ms. Lively's Statement to Law Enforcement

As part of their investigation, law enforcement took a written statement from Ms. Lively on April 28, 2014.[1] Ms. Lively's statement largely corroborated the Petitioner's own written statement, with Ms. Lively adding additional details regarding their activities

---

[1] In his brief, the Petitioner also appears to argue that the State improperly withheld a statement that Ms. Willin made to law enforcement. However, the post-conviction court found that "[n]o proof was presented that a statement existed as to [Ms.] Willin," and no such statement appears in the record for this appeal. More importantly, the Petitioner does not identify the contents of Ms. Willin's supposed statement or make any argument about how it would be material for *Brady* purposes. As such, in the absence of a complete and accurate appellate record on these issues, we must affirm the post-conviction court's denial of relief on these grounds. *See State v. Hamilton*, No. W2023-01127-CCA-R3-CD, 2024 WL 4130757, at *4 (Tenn. Crim. App. Sept. 10, 2024) (citing *State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991)), *perm. app. denied* (Tenn. Feb. 20, 2025).

before and after the shooting. In relevant part, the statement read as follows, with paragraph spacing added:

There was a lot of friction between [the Petitioner] and Big O. Big O, [the Petitioner] and Rocky were shooting target on Sunday. They were shooting a .357 pistol, the .22 pistol that [the Petitioner] used to kill Big O later as well as the .22 rifle that [the Petitioner] used to kill Big O too. I remember seeing the .44 muzzle loader pistol during the day. While Big O and [the Petitioner] were talking, something wasn't right, and I said something about the two of them needing to fix the problem, [the Petitioner] said the females had nothing to worry about. It was like Big O and [the Petitioner] were talking back and forth but they didn't want us girls to know what was going on. There was tension in the air.

Around 2:15 AM, I know it was 2:15 because Big O asked what time it was and I told him, Big O got the .44 muzzle loader pistol from the camper on the shelf above the big bed to the right of the door as you come into the camper. He also got trash bags, black industrial latex gloves. He said he was taking the garbage out. The garbage was already bagged up.

I got scared at this time. Big O was outside for about an hour, in the rain, during this time I saw a white guy in a white shirt and blue sleeves walk into [the] garage of the house. I don't know where he came from. Big O had turned on all the lights in the yard, two of the lights were facing from the camper to the garage and one was facing toward the gate and another one facing into the garage from the driveway. The man in the white shirt seemed to come from the shed area and not the road.

Big O comes into the camper about 3 AM, he was telling [the Petitioner] to come outside so he could show [the Petitioner] something. [The Petitioner] wouldn't go outside. Big O said he ran into some guy that said he would give Big O a house. Big O turned to us and asked us to guess who it was that was going to give us a house, just guess, just take a guess. Big O raised up the .44 black powder gun and started to point it at me and Jennifer and I was holding Jennifer real tight. [The Petitioner] shot Big O with the .22 pistol about 6 times I guess, to the head from about 3 feet away.

[The Petitioner] was by the table, and Big O was inside the door. The door was shut at first. Big O opened the door and his left hand on the door

3

and the gun in his right hand, he started to turn around again. When Big O started to turn around again, like he was turning toward us, [the Petitioner] got the .22 rifle off the table and [the Petitioner] shot Big O with the rifle. Big O was in the doorway. [The Petitioner] was still standing in the same place.

Big O started to go down the steps and then turned back around. At the bottom of the steps, [the Petitioner] grabbed another gun, I don't know what it was, but it was maybe 4 times, it could have been 1 time or 15 times, I don't know, I was scared. Big O never said he was going to kill any of us, but I was scared he might have killed all of us. This all happened real fast around 3 AM. I don't know if the lights were on in the yard or not. [The Petitioner] made Jennifer and I pack all our stuff and that we were going with him. [The Petitioner] left the camper and came back a few times. I don't know what he was doing outside.

We took all our stuff to the garage and he made Jennifer pour ammonia and water on the door of the camper to try to get the [sic] rid of the blood. [The Petitioner] and I took lighter fluid and poured it all over everything in the camper. Wall to wall, and floor to ceiling in the camper.

## 2.     Preliminary Hearing

Following the Petitioner's arrest, the General Sessions Court of Bledsoe County held a preliminary hearing in July 2014. Trial counsel was appointed to represent the Petitioner, who was also present for the hearing. The State called Ms. Lively as its first witness. Ms. Lively testified about the shooting in detail, acknowledged that she had given a statement to law enforcement, and agreed that her testimony "essentially" reflected what she had said in her statement.

On direct examination by the State, Ms. Lively said that Mr. Smith took the trash out of the camper at about 2:00 in the morning. She stated that Mr. Smith repeatedly attempted to persuade the Petitioner to come outside, but the Petitioner refused. Ms. Lively saw another person walking in the garage and that the Petitioner was scared, nervous, and worried.

Ms. Lively testified that Mr. Smith came back into the camper with black latex gloves and a .44 caliber handgun. When Mr. Smith raised the weapon in the direction of

4

Ms. Lively and Ms. Willin, the Petitioner reached for a nearby pistol and shot at Mr. Smith. Mr. Smith stumbled out the door, and the Petitioner followed him outside, continuing to fire. Ms. Lively testified that Mr. Smith never dropped his weapon after he had been shot and that he still had the pistol as he went outside.

The Petitioner's trial counsel engaged in an extensive cross-examination of Ms. Lively. During the cross-examination, Ms. Lively testified that it was unusual for Mr. Smith to take out the trash at two o'clock in the morning, particularly as Mr. Smith kept asking what time it was. When she saw the outside lights come on and observed another person outside, she told the Petitioner, who was worried and upset.

Ms. Lively said that when Mr. Smith reentered the camper wearing latex gloves and carrying a pistol, she thought she "was going to die. . . . [She] just knew it." When Mr. Smith raised the pistol in her direction, the Petitioner fired several shots at Mr. Smith, who did not drop his gun. Ms. Lively said that the Petitioner then grabbed a .22 caliber rifle and continued firing at Mr. Smith outside. When the Petitioner returned to the camper, he was scared and upset.

On redirect examination, the State used Ms. Lively's written statement to law enforcement to impeach her regarding the details of that night that she claimed she could not remember. The State also confronted Ms. Lively with some twelve or thirteen direct quotes from her statement, including the friction between the Petitioner and Mr. Smith, the tension in the air, the presence of guns on the property, Mr. Smith's possession of a gun on the night of the shooting, and the events of the shooting itself.

Thereafter, the general sessions court bound the case over to the consideration of the Bledsoe County grand jury, which later charged the Petitioner, in relevant part, with the offense of second degree murder. The trial court re-appointed trial counsel, and he worked with co-counsel to defend the case. The State provided pretrial discovery, though the materials did not include Ms. Lively's written statement. The Petitioner asked co-counsel to obtain the statement, and his trial attorneys interviewed Ms. Lively and discussed that interview with the Petitioner before the plea.

### 3. Plea Hearing

The parties entered into a plea agreement whereby the Petitioner agreed to plead guilty to the offense of second degree murder and receive a sentence of nineteen years. During the plea hearing held on April 27, 2015, the State announced that it expected Ms.

Lively to testify at trial that Mr. Smith pointed a gun at her and Ms. Willin and that this action led to the Petitioner shooting Mr. Smith. In relevant part, the State announced its factual basis as follows, again with paragraph spacing added:

> In the early morning hours of April 22, 2014, Mr. Orlando Smith got up from the camper trailer and went outside to do some work outside. Ms. Lively will testify that they were all doing methamphetamine during the course of their stay out there on this property.
>
> When Mr. Smith came back in the trailer he had an old 44 black-powder pistol in his hand, and was saying some things, and that Ms. Lively said that he raised a pistol in the direction -- the two women were on one side of the camper trailer and [the Petitioner] was on the other side of the trailer, and they raised the pistol in her direction.
>
> At that time [the Petitioner] took a 22 handgun and shot Mr. Orlando Smith in the head area several, or numerous times with that weapon. Mr. Orlando Smith went back out of the doorway. Then [the Petitioner] grabbed a 22 rifle, shot him numerous times with that weapon, and then finally he picked up a 16 gauge that had a 20 gauge shell in it and shot him with that.

During the State's recitation of facts, the Petitioner interjected to clarify that he did not put trash on Mr. Smith's body after the shooting but only moved trash cans around the body to obscure its view from the road. However, the Petitioner did not seek to clarify or ask any questions about Ms. Lively's anticipated testimony or her written statement.

The trial court accepted the plea and sentenced the Petitioner to a sentence of nineteen years to be served in the Tennessee Department of Correction.

## B. POST-CONVICTION PROCEEDINGS

In January 2016, the Petitioner filed a petition for post-conviction relief. In his initial filing, the Petitioner alleged only that he was unable to understand the nature and consequences of the plea due to medication he had taken at the time. After post-conviction counsel was appointed, she filed an amended petition that realleged only this ground for relief.

After a series of substitutions of post-conviction counsel, the Petitioner filed a second amended post-conviction petition in May 2021. In this second amended petition, he asserted for the first time that the State had violated his due process rights by withholding Ms. Lively's written statement given to law enforcement.

The Petitioner filed a supplemental brief shortly before the hearing explaining that the State's not disclosing the statement before the plea violated *Brady v. Maryland*, 373 U.S. 83 (1963). He argued that the State's withholding of the statement could have led him to falsely believe that Ms. Lively would not support his claim of self-defense. As such, he asserted that the State's actions undermined confidence in the outcome of the case.

### 1. Post-Conviction Hearing

On October 23, 2023, the post-conviction court held an evidentiary hearing. The Petitioner, trial counsel, and co-counsel were the only three witnesses. Regarding Ms. Lively's statement, the Petitioner testified that he was present during Ms. Lively's testimony at the preliminary hearing and remembered that the State "poked at a few things" that were inconsistent with Ms. Lively's testimony and her statement to law enforcement. The Petitioner further testified that he requested to see Ms. Lively's statement, but co-counsel replied that the State intended to hold the statement until trial.

Having had an opportunity to review the statement before the evidentiary hearing, the Petitioner asserted that he would not have pled guilty had he been given the statement before his plea. When asked why he would not have pled guilty, the Petitioner answered, reading from the statement, "Well, it's right there. 'Mr. Orlando Smith had a gun in my face[,] and I was in fear for my life. I thought he was going to kill us.'" However, the Petitioner acknowledged that Ms. Lively testified at the preliminary hearing that Mr. Smith raised a pistol in her face and that her testimony and statement were consistent in that regard. The Petitioner also acknowledged that he was aware before his plea that his trial attorneys had interviewed Ms. Lively but did not recall ever discussing the substance of that interview with them.

On cross-examination, the Petitioner admitted that he could have been sentenced as a Range II, multiple offender for the second degree murder charge, having previously been convicted of attempted second degree murder, robbery, and aggravated assault. The Petitioner also agreed that the State announced Ms. Lively's anticipated testimony at the plea hearing, including that Mr. Smith pointed a gun at her and Ms. Willin before the Petitioner shot him. Finally, the Petitioner conceded that he was present at the preliminary

hearing when Ms. Lively testified that Mr. Smith had a gun and was pointing it at her before the Petitioner shot him.

Trial counsel was the next witness to testify. He recalled that Ms. Lively testified at the preliminary hearing that she thought she was going to die. Trial counsel confirmed that, while Ms. Lively was listed as a witness in discovery provided by the State, he never received her written statement. Trial counsel stated that he interviewed Ms. Lively and knew that he or co-counsel spoke to the Petitioner about that interview.

On cross-examination, trial counsel agreed that Ms. Lively's statement, her preliminary hearing testimony, and her interview were consistent with each other. He also agreed that he knew from the preliminary hearing and his interview with Ms. Lively that she was scared during the encounter with Mr. Smith. Trial counsel stated that, before the plea, he "pretty much" knew the information possessed by Ms. Lively that could be used to support a self-defense claim.

The final witness at the evidentiary hearing was co-counsel. Co-counsel testified that she was present for the Petitioner's preliminary hearing and was aware of Ms. Lively as an important eyewitness. She further stated that she requested the State provide Ms. Lively's statement to law enforcement but never received it. Co-counsel testified that she was present at Ms. Lively's interview and that she would have discussed it with the Petitioner, though she did not recall exactly what was said.

Co-counsel confirmed that, at the time of the Petitioner's plea, she was aware that Mr. Smith was armed and Ms. Lively was afraid of being shot. She agreed that Ms. Lively testified that she was afraid of being shot by Mr. Smith at the preliminary hearing as well, and that Mr. Smith's possessing a gun was not new information provided by the written statement.

## 2.     Grant of Post-Conviction Relief

Following the hearing, the post-conviction court granted the Petitioner's claim for relief through a written order entered on December 20, 2023. The court found that the State violated its obligations under *Brady* when it suppressed a witness statement that the Petitioner requested and that the statement was favorable to the Petitioner. The court also concluded that the statement was material, though it did not make a finding that there was a reasonable probability that, had the statement been disclosed to the Petitioner, the result

of the proceeding would have been different. The State filed a timely notice of appeal on January 19, 2024.

## STANDARD OF APPELLATE REVIEW

Our supreme court has recognized that "the first question for a reviewing court on any issue is 'what is the appropriate standard of review?'" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). In this case, the principal issue is whether the post-conviction court properly granted relief because the Petitioner showed that the State violated his due process rights under *Brady*. In this context, we review the lower court's "findings of fact, such as whether the defendant requested the information or whether the state withheld the information de novo with a presumption that the findings are correct unless the evidence preponderates otherwise." *State v. Thomas*, 687 S.W.3d 223, 253 (Tenn. 2024) (citation, omission, and internal quotation marks omitted). However, we review the trial court's conclusions of law, such as whether the information was favorable or material, "under a purely de novo standard with no presumption of correctness." *Id.* (citation and internal quotation marks omitted).

## ANALYSIS

The Tennessee Post-Conviction Procedure Act provides an avenue for relief "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2018). A post-conviction petitioner has the burden of proving his or her allegations of fact with clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2018). For evidence to be clear and convincing, "it must eliminate any 'serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014) (quoting *State v. Sexton*, 368 S.W.3d 371, 404 (Tenn. 2012)).

The State first argues that the due process protections of *Brady* are not applicable to a case that resulted in a plea, such as the Petitioner's. In the alternative, the State contends that even if *Brady* is applicable in this case, the withheld statement is not material because the information was made available to the Petitioner and his lawyers through other disclosures.

In response, the Petitioner distinguishes between impeachment and exculpatory evidence and argues that *Brady* requires the disclosure of exculpatory evidence before a

plea.  In addition, the Petitioner appears to argue that Ms. Lively's statement was "material," either because it supported his claim of self-defense or because the information in that statement was not made available through other disclosures that would have bolstered the Petitioner's anticipated defense at trial.  Without finding that *Brady* applies in this context, we agree with the State that the statement was not material.

### A.  *BRADY* AND THE TIMING OF DISCLOSURES

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *See also Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001).  As our supreme court has recognized,

> To establish a Due Process violation based on *Brady*, a defendant must show that: (1) the defendant requested the evidence (unless the evidence is obviously exculpatory, in which case the prosecution is bound to produce the information, without a request); (2) the State suppressed evidence in its possession; (3) the suppressed evidence was favorable to the defendant; and (4) the evidence was material.

*State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014) (citing *Johnson*, 38 S.W.3d at 56).  Importantly, "[a]ll of the *Brady* requirements must be met in order to show a *Brady* violation."  *Watson v. State*, No. W2019-00489-CCA-R3-PC, 2020 WL 7786957, at *13 (Tenn. Crim. App. Dec. 30, 2020), *perm. app. denied* (Tenn. Mar. 23, 2021).

The State first argues that no *Brady* violation occurred in this case because *Brady* did not require disclosure of Ms. Lively's statement prior to the Petitioner's plea.  It is true that the United States Supreme Court has held that impeachment evidence need not be disclosed prior to a plea.  *See United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("We must decide whether the Constitution requires that pre[-]guilty plea disclosure of impeachment information.  We conclude that it does not."); *In re Petition to Stay the Effectiveness of Formal Ethics Opinion 2017-F-163*, 582 S.W.3d 200, 211 (Tenn. 2019).  However, the Petitioner distinguishes *Ruiz* by arguing that impeachment evidence differs from exculpatory evidence under *Brady* and that several federal circuits have held that the State must disclose exculpatory evidence before a plea.

Our research shows that a few federal circuits cited by the Petitioner require the disclosure of exculpatory evidence before a plea, but several others do not. *Compare, e.g.*, *United States v. Ohiri*, 133 F. App'x 555, 561-62 (10th Cir. 2005) *with Alvarez v. City of Brownsville*, 904 F.3d 382, 394 (5th Cir. 2018) (en banc) (identifying cases and stating that "case law from the Supreme Court, this circuit, and other circuits does not affirmatively establish that a constitutional violation occurs when *Brady* material is not shared during the plea bargaining process"). For our part, this court has recognized that *Brady* does not require disclosure of even exculpatory information in some pretrial proceedings, such as a preliminary hearing. *See State v. Kibodeaux*, 680 S.W.3d 320, 336 (Tenn. Crim. App. 2023). However, we have also recognized the possibility that a guilty plea may be withdrawn under Tennessee Rule of Criminal Procedure 32(f) if it is "induced by the [S]tate's misrepresentation that it possessed no evidence favorable to his position." *State v. Davis*, 823 S.W.2d 217, 219-20 (Tenn. Crim. App. 1991).

In this case, the post-conviction court found that Ms. Lively's statement was "favorable" to the Petitioner, but it did not address whether the State had an obligation to disclose the information in the first instance. It also made no finding whether Ms. Lively's statement was exculpatory or merely had impeachment value, as the State insisted. Nevertheless, we need not decide whether the State was obliged to disclose Ms. Lively's statement to the Petitioner prior to his plea. As we discuss below, the Petitioner has failed to show that he was unaware of any information contained in her statement in the first instance and, therefore, failed to show that the State violated any possible *Brady* obligations in the second.

## B. *BRADY* AND THE MATERIALITY REQUIREMENT

The State next argues that Ms. Lively's statement was not material because the information within it was disclosed in other forms. In response, the Petitioner focuses his attention on the State's obligation to disclose the statement, devoting comparatively little attention to whether the statement was material. As to materiality, his brief offers only that disclosure of the statement would have shown him that another witness confirmed his belief as to self-defense. We respectfully disagree with the Petitioner that Ms. Lively's statement was material or that its absence undermined confidence in the Petitioner's plea.

### 1. The Requirement of Materiality Generally

Our supreme court has recognized that "the current requirement for undisclosed evidence to be considered 'material' is that the nondisclosure of evidence must be 'so

serious' that it creates 'a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Thomas*, 687 S.W.3d at 254 (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). Put another way, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *In re Petition to Stay the Effectiveness of Formal Ethics Op. 2017-F-163*, 582 S.W.3d at 206 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)); *see also Johnson*, 38 S.W.3d at 58.

Importantly, the "reasonable probability standard" does not require a showing that disclosure of the evidence "would more likely than not" have resulted in a different outcome. *See Johnson*, 38 S.W.3d at 58. Nor is the standard tantamount to a review of the legal sufficiency of the convicting evidence. *Id.* Instead, evidence is material when it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Jackson*, 444 S.W.3d at 595-96; *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) ("The reversal of a conviction is required upon a 'showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" (citation omitted)).

Three corollaries are important. First, the materiality of withheld evidence is evaluated "in the context of the entire record." *See, e.g.*, *Jordan v. State*, 343 S.W.3d 84, 97 (Tenn. Crim. App. 2011) ("Thus, the materiality of the suppressed evidence must be evaluated within the context of the entire record as to how it impacts the innocence or guilt of the accused."); *Hughbanks v. Hudson*, 2 F.4th 527, 540 (6th Cir. 2021) (citation omitted). In performing that evaluation, the court must "undertake a careful, balanced evaluation of the nature and strength of both the evidence the defense was prevented from presenting and the evidence each side presented at trial." *Bies v. Sheldon*, 775 F.3d 386, 399 (6th Cir. 2014). As such, a defendant "seeking to establish materiality should call to the attention of the reviewing court any and all ways in which suppression of evidence impaired the adversary process and undermined confidence in the outcome of the proceeding." *Jackson*, 444 S.W.3d at 595; *State v. Tice*, No. M2021-00495-CCA-R3-CD, 2022 WL 2800876, at *28 (Tenn. Crim. App. July 18, 2022), *perm. app. denied* (Tenn. Dec. 14, 2022).

Second, "*Brady* is concerned only with cases in which the government possesses information which the defendant does not, and the government's failure to disclose the information deprives the defendant of a fair trial." *United States v. Conteh*, 234 F. App'x 374, 389 (6th Cir. 2007) (citing *United States v. Mullins*, 22 F.3d 1365 (6th Cir. 1994)). As such, our courts have recognized that the State's duty of disclosure "does not extend to information that the defense already possesses, or is able to obtain[.]" *State v. Robinson*,

146 S.W.3d 469, 512 (Tenn. 2004); *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). After all, "[t]here is no *Brady* violation where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available . . . from another source, because in such cases there is really nothing for the government to disclose." *Berry v. State*, 366 S.W.3d 160, 179-80 (Tenn. Crim. App. 2011) (citation omitted; omission in original).

Third, even in those federal circuits where the government's *Brady* obligations extend to disclosure before a plea, the materiality of the withheld information "is analyzed through an 'objective inquiry.'" *United States v. Overton*, 24 F.4th 870, 878 (2d Cir. 2022). This objective inquiry does not ask "what a particular defendant would do but rather what is the likely persuasiveness of the withheld information." *United States v. Walters*, 269 F.3d 1207, 1215 (10th Cir. 2001) (citation omitted). Thus, the mere fact that a petitioner asserts he would not have pled guilty had he known of the withheld evidence is insufficient to grant relief. Rather, the information must be "so persuasive on its face that it could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *See United States v. Dahl*, 597 F. App'x 489, 491 (10th Cir. 2015) (citation and internal quotation marks omitted).

### 2. Absence of Materiality in Ms. Lively's Statement to Law Enforcement

With these principles in mind, we turn to the case at bar. The State argues that Ms. Lively's statement to law enforcement was not material because the Petitioner was, at the time of his plea, already aware of the witness and the substance of her statement to law enforcement. It observes that Ms. Lively testified at the preliminary hearing and was interviewed by the Petitioner's trial counsel. The State also emphasizes that it announced at the plea hearing that Ms. Lively's anticipated testimony would support the Petitioner's self-defense claim. We agree.

The post-conviction court made no factual findings to support its conclusion that the statement was material, and it did not identify the ways in which the information in Ms. Lively's statement was disclosed to the Petitioner, either directly or in substance, prior to his plea. Nevertheless, evaluating the withheld statement in the context of the entire record, it is clear that the substance of the statement was fully disclosed to the Petitioner in Ms. Lively's preliminary hearing testimony, in her interview with his lawyers, and in the plea hearing. For example, we first observe that Ms. Lively testified at the preliminary hearing that Mr. Smith took the garbage outside the camper at 2:00 in the morning. While outside, Mr. Smith turned on the lights and called for the Petitioner to join him. Ms. Lively also

saw another person near the garage, and she said that these circumstances caused her to be afraid and that the Petitioner was scared, nervous, and worried.

Ms. Lively further testified that when Mr. Smith reentered the camper, he was wearing black latex gloves and holding a gun. She said that Mr. Smith then raised the gun and pointed it at her and Ms. Willin before the Petitioner started shooting him. Ms. Lively later confirmed that Mr. Smith was holding a gun in her interview with trial counsel, and the State's recitation of facts at the plea hearing included that "Ms. Lively said that [Mr. Smith] raised a pistol in [their] direction[.]" Importantly, Ms. Lively testified that when Mr. Smith reentered the camper wearing latex gloves and carrying a pistol, she thought she "was going to die. . . . [She] just knew it."

Our review of the record is confirmed by trial counsel's observations as well. Testifying at the post-conviction hearing, both lead counsel and co-counsel confirmed that they received a copy of Ms. Lively's statement several months before the hearing. When asked about the statement, lead counsel testified that it was consistent with her preliminary hearing testimony and his interview with her. Both lawyers agreed that Ms. Lively previously testified that she was afraid of being shot and killed by Mr. Smith and that Mr. Smith was armed at the time the Petitioner shot him. Indeed, lead counsel observed that he was "pretty much" aware of the information Ms. Lively had that could have supported a self-defense claim.

Finally, while questions of materiality do not test the legal sufficiency of the evidence, "we do not ignore other evidence presented at trial in determining our confidence in the outcome. Instead, we evaluate the whole case, taking into account the effect that the suppressed evidence, had it been disclosed, would have had on the evidence considered at trial." *Juniper v. Davis*, 74 F.4th 196, 210 (4th Cir. 2023) (citation and internal quotation marks omitted). In this case, the Petitioner's plea was also affected by other information as well. Trial counsel testified that the Petitioner's sentencing exposure was as much as fifty years, given his prior felony convictions, juvenile record, and probation status at the time of the events. The Petitioner was also aware of his own statement to law enforcement in which he admitted to firing twenty rounds from three separate weapons and shooting Mr. Smith while Mr. Smith was outside on the ground, yelling, "Wait, Wait." Following the killing, the Petitioner did not call for help, hid the body behind some trash bins, and destroyed evidence. In the words of his trial counsel, the Petitioner's actions "turned a pretty good self-defense case into a not very good self-defense case."

14

When placed in the context of the entire record, including what the Petitioner knew at the time of his plea, we simply cannot conclude that Ms. Lively's statement to law enforcement was material. He is not entitled to post-conviction relief.

### 3. The Petitioner's Arguments

The Petitioner disagrees with this conclusion. Although the post-conviction court did not identify how Ms. Lively's statement differed from other information disclosed to the Petitioner, the Petitioner opined during the appellate argument about three ways that the non-disclosure of the statement affected his decision to plead guilty. First, he claimed the statement showed that Mr. Smith had the gun during the entire encounter and was a continuing threat. Second, he suggested that the statement contained more detail about the movements of the individuals in the camper and outside. Third, he said the statement provided more detail in the description of Mr. Smith's animus toward the Petitioner.

However, the record belies these new claims of material differences between Ms. Lively's statement and the other disclosures. First, the State directly confronted Ms. Lively at the preliminary hearing about Mr. Smith being armed throughout the encounter, and the assistant district attorney quoted this specific portion of the statement in his redirect examination of her. In so doing, the State disclosed that Ms. Lively said in her statement that Mr. Smith first obtained the .44 caliber muzzleloading pistol before he went outside of the camper. Ms. Lively also testified that Mr. Smith had the pistol when he re-entered the camper about an hour later. More importantly, on questioning from the court itself, Ms. Lively confirmed that Mr. Smith "never dropped the gun after he'd been shot," and that he was still holding his weapon when he stumbled out of the camper. As such, the Petitioner and his lawyers were fully aware of the substance of Ms. Lively's statement on this particular point.

Second, Ms. Lively's statement does not, in fact, provide additional context about Mr. Smith's "movements" during the encounter apart from her testimony. In her statement, Ms. Lively indicated that Mr. Smith initially remained in the camper, took out the trash, and then spent about an hour outside. During this time, Mr. Smith turned on the outside lights and called for the Petitioner to join him. When the Petitioner did not respond, Mr. Smith went back into the camper and raised his pistol at the occupants. After the Petitioner shot him several times, Mr. Smith stumbled out of the camper, where the Petitioner continued to shoot him.

15

Despite the Petitioner's claim in this appeal, Ms. Lively testified to all of these facts during the preliminary hearing, and the State recited many of these same facts again during the plea colloquy. Ms. Lively's statement does not reveal any pertinent information about Mr. Smith's movements during the encounter that was not disclosed in the preliminary hearing. As before, the Petitioner and his lawyers were fully aware of this information at the time of his plea.

Third, the Petitioner asserts that the statement better depicts Mr. Smith's animus towards him. This claim has no support in the record. In her statement, Ms. Lively mentioned that "[t]here was a lot of friction" between the Petitioner and Mr. Smith, noting that "[t]here was tension in the air." The assistant district attorney quoted these precise portions of Ms. Lively's statements while questioning her during the preliminary hearing. In addition, Ms. Lively testified that there was "a tension you could feel." As before, the Petitioner and his lawyers were aware of the specifics of Ms. Lively's statement on this matter at the time of his plea.

Finally, the Petitioner argues that the withheld statement was material because it subjectively reinforced his belief that his self-defense claim had support. This argument lacks merit as a basis for relief. As we observed above, the federal cases cited by the Petitioner evaluate materiality under an objective standard, not a subjective one. As such, the Petitioner's subjective assurance that he would have insisted on a trial is insufficient where materiality is objectively lacking otherwise. Given that the essential information contained in the withheld statement was previously disclosed, we cannot conclude that the disclosure of Ms. Lively's statement was so persuasive on its face that, in context, it would have objectively resulted in the Petitioner's rejection of the plea.

Upon our de novo review of the record, we conclude that the withheld statement does not meet the materiality standard under *Brady v. Maryland*. Specifically, the Petitioner has not demonstrated that the statement "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [plea]." *Jackson*, 444 S.W.3d at 595-96. Although the Petitioner testified that he would not have pled guilty if the statement had been disclosed, the trial court did not explicitly credit this assertion, weakening its persuasive value. Furthermore, the substance of Ms. Lively's statement had already been disclosed to the Petitioner and his counsel through Ms. Lively's preliminary hearing testimony, her interview with his lawyers, and the plea hearing. The Petitioner has not identified any distinct or significant information in the withheld statement that was previously unknown or unavailable to him at the time of his plea. Accordingly, we conclude that the record does not support the conclusion that the withheld statement was material under *Brady*.

**CONCLUSION**

In summary, and upon our de novo review, we hold that the Petitioner has failed to show that a witness statement withheld by the State was material under *Brady v. Maryland*. Accordingly, we respectfully reverse the judgment of the post-conviction court granting relief and remand the case to reinstate the Petitioner's conviction.

s/ *Tom Greenholtz*
TOM GREENHOLTZ, JUDGE